UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
KEELY HENDERSON,                    )
                                    )
                  Plaintiff,        )
                                    )   Civil Action
v.                                  )   No. 19-11012-PBS
                                    )
ANDREW M. SAUL,                     )
                                    )
Commissioner of the                 )
Social Security Administration,     )
                                    )
                  Defendant.        )
_____ )

**MEMORANDUM AND ORDER**

March 12, 2020

Saris, D.J.

**INTRODUCTION**

Plaintiff Keely Henderson brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of a final decision denying her application for Supplemental Security Income ("SSI") and Social Security Disability Insurance benefits ("SSDI"). Plaintiff suffers from numerous physical and mental conditions, but only her physical conditions are at issue in this action. Those conditions include endometriosis,[1]

---

[1] Endometriosis is a condition in which tissue that normally lines the uterus grows outside the uterus, "frequently forming cysts." Stedman's Med. Dictionary 592 (27th ed. 2000).

1

fibromyalgia,[2] migraine headaches, and irritable bowel syndrome ("IBS").

Plaintiff contends that the Administrative Law Judge ("ALJ") erred by, among other defects, discounting the treating source opinion of her primary care physician. For the reasons below, the Court **ALLOWS** Plaintiff's motion to remand (Dkt. No. 16) and **DENIES** Defendant's motion to affirm (Dkt. No. 22).

## FACTUAL BACKGROUND

Plaintiff initially applied for SSI/SSDI on November 7, 2016, when she was 19 years old. She obtained her GED in 2015 after dropping out of school in the 11th grade due to excessive absence caused by her mental conditions. She has previously worked as a cashier, cook, and dishwasher, but has not worked since 2015.

### I. Medical History

Plaintiff has had a long and well-documented history of medical problems. Since the 5th grade, she has been seen by a gynecologist for pre-menstrual abdominal and pelvic pain. Plaintiff first complained of painful periods to her doctors on or around December 7, 2010, during a visit with Dr. Julianne Hertko-Adams, M.D., of Quincy Pediatric Associates ("QPA"). At

---

[2] Fibromyalgia is defined as "a syndrome of chronic pain of musculoskeletal origin but uncertain cause." Stedman's Med. Dictionary, at 671.

this appointment, Plaintiff's mother stated that Plaintiff was experiencing irregular periods with painful cramps. Dr. Hertko-Adams diagnosed Plaintiff with dysmenorrhea[3] and referred her to a gynecologist. Over the next four years, Plaintiff visited the doctors at QPA with many mentions of her dysmenorrhea. At one typical appointment with Dr. Hertko-Adams on June 1, 2012, Plaintiff described her pain level as 9 out of 10, with right and lower abdomen pain lasting for one week at a time.

On April 10, 2015, Plaintiff was referred to Dr. Amy D. DiVasta, M.D., at Boston Children's Hospital ("BCH") to discuss her painful periods. At this appointment, Plaintiff complained that "during her menses she has severe pain and cannot get out of bed." R. 874. At Dr. DiVasta's recommendation, Plaintiff underwent a transabdominal ultrasound and then a pelvic CT scan, which resulted in a diagnosis of a likely ovarian cyst. She was prescribed a "moderate dose" of Combined Oral Contraceptives ("COCs") and Nonsteroidal Anti-inflammatory Drugs ("NSAIDs") for the pain. R. 876.

Throughout the remainder of 2015, Plaintiff had one or more appointments each month regarding her menstrual pain. She was initially prescribed a NuvaRing but, due to adverse side effects, she switched to a Progestin-based Mirena intrauterine

---

[3] Dysmenorrhea is defined as difficult and painful menstruation. Stedman's Med. Dictionary, at 552.

device ("IUD"). Over the course of these appointments, she was also prescribed Anaprox and Voltaren, NSAIDs used to reduce pain, Simethicone, a medication used to reduce bloating and abdominal pain, and Aygestin, a hormonal treatment.

At one appointment on October 12, 2015, Dr. DaVista noted that Plaintiff reported pain that was so bad she had cried non-stop for four hours. Dr. DiVasta indicated that Plaintiff "frequently" missed work because of the pain. R. 861. Dr. DiVasta referred Plaintiff to gynecologist Dr. Marc Laufer, M.D. Upon Dr. Laufer's recommendation, on November 18, 2015, Plaintiff underwent a laparoscopy, a minimally invasive surgical procedure to examine abdominal organs. Dr. Laufer diagnosed Plaintiff with "Stage 1 endometriosis." R. 652.

On March 25, 2016, Plaintiff had a follow up appointment with Dr. Laufer. At this time, she was still using Aygestin and her Mirena IUD but reported daily spotting and bleeding with a pain level of 8 out of 10. Because of the severe pain, Dr. Laufer prescribed Synarel, a hormone spray used to treat endometriosis, to be used twice daily. In subsequent appointments after the Synarel treatment, Plaintiff reported a pain level of 2 out of 10. She was then referred to the Pain Management Center at Brigham and Women's Hospital.

On June 24, 2016, Plaintiff informed Dr. DiVasta that she had continued to experience severe pelvic and back pain. She had

been recently evaluated by the Pain Management Center, where she was prescribed a pain medication called Gabapentin, physical therapy, a transcutaneous electrical nerve stimulator (TENS) unit, which is a pain-reduction device, and Lidoderm patches, which are also used to relieve nerve pain. Plaintiff was referred to a gastroenterologist for her IBS. At this appointment, Dr. DiVasta mentioned for the first time that "there is some concern of fibromyalgia as well." R. 857.

In further appointments, Plaintiff was seen by Dr. Laufer and Dr. DiVasta for "further evaluation and management of chronic pelvic pain and endometriosis." R. 938. At her appointment on October 13, 2016, Dr. Laufer noted that Plaintiff had been taken off estrogen patches and Aygestin because of the negative side effects on her mental and physical health. She reported a pain level of 7 out of 10. At another appointment the following day, Plaintiff reported ongoing debilitating headaches, pelvic pain, abdominal pain, and back pain. She had also stopped taking Syranel due to adverse side effects.

On January 5, 2017, Plaintiff visited Dr. Laufer again and reported a pain level of 8 out of 10 when bleeding and between 0 and 7 out of 10 when not bleeding. She was prescribed Camila hormonal therapy to help with the pain. On the same day, she visited Nurse Practitioner Christine Shusterman for a pain treatment visit. During this visit, Plaintiff reported

experiencing headaches every 1-2 days with all-over-body pain and diffuse muscle soreness. Shusterman instructed her to continue her physical activity, continue taking Gabapentin, and use Diclofenac and Tramadol — additional pain medications — as needed.

On June 8, 2017, Dr. Laufer stated that Plaintiff "is not doing well." R. 919. Dr. Laufer prescribed Femara hormonal therapy to be used alongside Plaintiff's existing IUD and stopped the Camila hormonal therapy due to symptoms of worsening depression.

In a follow-up appointment on July 20, 2017, Dr. DiVasta noted Plaintiff's work with the Pain Service Clinic and that she was following the recommended measures, including physical therapy. With regards to Plaintiff's IBS, Dr. DiVasta instructed her to continue taking Senna, Culturelle, and Benefiber, all used to promote digestion and relieve IBS pain.

On September 28, 2017, during an appointment with Dr. Laufer, Plaintiff reported daily bleeding with a pain level of 7 out of 10. She was "not doing well" and was taken off Femara, so she remained only on the Minera hormonal therapy as treatment for her endometriosis. R. 917.

Finally, on April 30, 2018, Plaintiff met with Dr. Katerina Byanova, M.D., a rheumatologist at Beth Israel Deaconess Medical Center, regarding her potential fibromyalgia diagnosis. In her

6

report, Dr. Byanova noted Plaintiff was exhibiting symptoms of "whole body pain, fatigue, poor functional status, post-exercise fatigue . . . all consistent with fibromyalgia." R. 994. Plaintiff reported no significant benefit from Gabapentin but was better tolerating Amitriptyline, an antidepressant also used to treat nerve pain. Dr. Byanova recommended daily exercise, yoga, meditation, and cognitive behavioral therapy to help her symptoms. Plaintiff declined a physical therapy referral but said she was willing to try on her own.

II. **State Agency Medical Consultant Evaluations**

On November 7, 2016, Plaintiff filed a claim for disability based on endometriosis, IBS, pain amplification syndrome, asthma, depression, anxiety, visceral hyperalgesia, and chronic headaches. As part of that application, Dr. Karen Grande, M.D., evaluated Plaintiff on March 28, 2017. Dr. Grande's evaluation listed Plaintiff's medically determinable impairments as migraines (primary), depressive, bipolar and related disorders (secondary), and somatic symptoms and related disorders (other impairment). R. 82. Dr. Grande concluded Plaintiff was "not disabled" after determining she was "able to tolerate simple changes in routine, avoid hazards, travel independently, and make and carry out simple plans." R. 86-88.

Upon reconsideration on August 3, 2017, Dr. Robin Tapper, M.D., evaluated Plaintiff and affirmed the initial determination

regarding Plaintiff's functional capacity. Like Dr. Grande, Dr. Tapper listed Plaintiff's migraines as her primary condition and listed fibromyalgia as "other." R. 110. Dr. Tapper determined that Plaintiff retained the capacity to perform light exertion that avoids climbing ropes, ladders, and scaffolds as well as concentrated exposure to extreme cold, extreme heat, hazards, dust, fumes, odors, gases, and poor ventilation.

### III. Treating Physician Medical Source Opinion

On February 6, 2018, Dr. DiVasta, Plaintiff's treating physician since 2015, completed a functional capacity assessment. Dr. DiVasta listed Plaintiff's diagnoses as endometriosis and chronic pelvic pain, chronic fatigue, mild intermittent asthma, depression, and IBS. Dr. DiVasta reported that Plaintiff's prognosis was "poor." R. 941. She further stated that Plaintiff was limited in how long she can sit, stand, and lift, and that Plaintiff would require frequent unscheduled breaks in order to use the restroom. Additionally, Plaintiff would be absent from work for three or more days per month and could not tolerate any stress due to her depression and anxiety.

## Procedural History

### I. Applications

In Plaintiff's November 7, 2016 application for SSDI and SSI, she alleged a disability onset date of October 1, 2015.

Both applications were denied initially and again upon reconsideration.

   II. **ALJ Hearing**

Plaintiff requested an ALJ hearing, which was conducted in front of ALJ Henry Hogan on May 15, 2018, with counsel and a vocational expert present

At the hearing, Plaintiff's counsel explained that Plaintiff suffered from endometriosis, fibromyalgia, IBS, asthma, and severe anxiety and depression. Plaintiff testified that due to her medical conditions, she experienced occasions of dizziness, had fainted at work, and had frequent and unexpected long trips to the restroom. Her endometriosis and migraines also caused poor attendance at her past job, eventually leading to her termination. She testified that after doctor visits, she is "utterly exhausted" for the next two to five days. R. 59.

Regarding Plaintiff's pain levels, the ALJ asked where and when her pain occurred and what she does to resolve it. Plaintiff responded that her pain occurs in her lower back, neck, and shoulders, and that the pain sometimes goes away but not always. She added that due to the pain, she cannot sit for long, sometimes not even thirty minutes at a time. During her testimony about her medications, Plaintiff stated that "some hurt more than they helped," but that she only stops medications upon her doctors' recommendations. R. 47.

9

**III. ALJ Decision**

On July 18, 2018, the ALJ issued a decision finding Plaintiff not disabled. The ALJ had followed the five-step process for determining disability and, at step three, found that Plaintiff suffered from the severe impairments of asthma, endometriosis, fibromyalgia, depression, and other somatic complaints, "significantly limit[ing] the ability to perform basic work activities[.]" R. 21. At step five, the ALJ found that Plaintiff "has the residual functional capacity to perform sedentary work" but is "limited to simple routine and repetitive tasks" in a "low stress job defined as having only occasional changes in the work setting." R. 27.

The ALJ found that Plaintiff's "testimony is not sufficient to establish limitations beyond" the residual functional capacity ("RFC") he described "given the objective medical evidence, the prescribed course of treatment and the claimant's daily activities." R. 28. In conducting his analysis, the ALJ gave great weight to the state-agency psychological consultants, some weight to Dr. Robin Tapper, the state-agency medical consultant, and found that the weight of the evidence did not support the disabling level of limitations found in the opinions of the treating source physicians, including Dr. DiVasta.

Plaintiff appealed the ALJ's decision to the Appeals Council, which denied her request on March 28, 2019.

10

**Legal Standards**

I. **Statutory and Regulatory Framework**

Under the Social Security Act, a claimant seeking benefits must prove that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To meet this definition, a person must have a severe impairment that renders him unable to do his past relevant work "or any other substantial gainful work that exists in the national economy." 20 C.F.R. § 416.905(a).

ALJs employ a five-step sequential evaluation process to assess a claim for disability benefits. See id. §§ 404.1520(a)(4)(i)-(v), 404.1594. The evaluation may be concluded at any step in the process if the ALJ determines that the claimant is or is not disabled. Id. § 404.1520(a)(4).

> The steps are: (1) if the applicant is engaged in substantial gainful work activity, the application is denied; (2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; (3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; (4) if the applicant's [RFC] is such that he or she can still perform past relevant work, then the application is denied; (5) if the applicant, given his or her [RFC], education, work experience, and age, is unable to do any other work, the application is granted.

11

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20 C.F.R. § 416.920).

## II. **Standard of Review**

The Court may set aside the ALJ's decision if it resulted from legal error or if the factual findings were not supported by substantial evidence. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). The Court reviews the ALJ's conclusions of law de novo. Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). "Failure of the [ALJ] to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with the sufficient basis to determine that the [ALJ] applied the correct legal standards are grounds for reversal." Weiler v. Shalala, 922 F. Supp. 689, 694 (D. Mass. 1996) (citing Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982)). Where application of the correct legal standard could support a different conclusion, the agency's decision must be remanded. See Ward, 211 F.3d at 656 (citing Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998)).

For findings of fact, "even if the record arguably could justify a different conclusion," the Court must affirm the decision "so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (citing Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981). Substantial evidence

exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion." Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). Substantial evidence does not exist when the ALJ's factual findings are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35. The Court examines the record in its entirety to determine the weight and "substantiality" of the evidence. Rohrberg v. Apfel, 26 F. Supp. 2d 303, 306 (D. Mass. 1998).

## **DISCUSSION**

### I. **Treating Source Rule**

Plaintiff applied for benefits prior to March 27, 2017, the date that the Social Security Administration's final rule altering the standard for evaluating treating source opinions became effective. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (to be codified at 20 C.F.R. pts. 404, 416). Therefore, the treating source rule applies. See id.; 20 C.F.R. § 404.1527.

Under that rule, "[c]ontrolling weight will be given to a treating [source]'s opinion on the nature and severity of a claimant's impairments" so long as the opinion "'is well-supported by medically acceptable clinical and laboratory

13

diagnostic techniques and is not inconsistent with the other substantial evidence' in the record." Bourinot v. Colvin, 95 F. Supp. 3d 161, 175 (D. Mass. 2015) (quoting 20 C.F.R. § 404.1527(c)(2)). Under the applicable regulations, a "treating source" is an "acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). As an M.D. who is Plaintiff's primary care physician, Dr. DiVasta is a treating source. See id. § 404.1502.

A treating source's opinion is not entitled to controlling weight when an ALJ determines that the opinion is not well-supported by the medical evidence or is inconsistent with other substantial evidence. See id. §§ 404.1527(c)(2), 416.927(c)(2). If the treating source opinion is not entitled to controlling weight, "the ALJ considers an array of factors to determine what weight to grant the opinion." Bourinot, 95 F. Supp. 3d at 176. These factors include: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence in support of the medical opinion; (4) the consistency of the medical opinion with the record as a whole; (5) the medical source's specialty; and (6) other factors which tend to support

or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

An ALJ need not expressly address each factor but must provide "good reasons" for the weight assigned to the treating source's opinion. Bourinot, 95 F. Supp. 3d at 177 (quoting 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)). If the ALJ gives little weight to a treating source, the ALJ should "state with particularity" the reasons for that decision. Hidalgo-Rosa v. Colvin, 40 F. Supp. 3d 240, 247 (D.P.R. 2014) (citing Sharfaz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987). "[R]emand is proper if those reasons are 'unpersuasive' or 'significantly flawed.'" Lemieux v. Berryhill, 323 F. Supp. 3d 224, 229 (D. Mass. 2018) (quoting Johnson v. Astrue, 597 F.3d 409, 411-12 (1st Cir. 2009)).

## II. ALJ's Treatment of the Treating Source Opinion

The ALJ's entire discussion of Dr. DaVista's opinion was that he found "that the weight of the evidence does not support the disabling level of limitations contained in [the treating source's] formulations. The evidence, including Dr. Divasta's [sic] . . . does not support this degree of limitations." R. 29.

The ALJ defined Plaintiff's residual capacity as far less severe than the treating physician opined. This analysis was significantly flawed.

15

Of the six criteria by which an ALJ must evaluate the weight of a treating opinion, several factors not mentioned by the ALJ weigh heavily in favor of giving Dr. DaVista's opinion controlling or at least significant weight. For example, Dr. DiVasta had been treating Plaintiff as her primary care physician for almost three years, saw Plaintiff on a regular basis, and was a specialist in adolescent gynecology.

The ALJ here relied on only one of the listed criteria — that the functional limitations set by Dr. DiVasta were not supported by other evidence in the record. See 20 C.F.R. § 404.1527(c)(2)-(6). The ALJ did not engage with the evidence in the record that was perfectly consistent with Dr. DiVasta's functional capacity limitations. For example, on February 6, 2018, Dr. DiVasta wrote that Plaintiff's prognosis was "poor," with "[n]o to little improvement made in reducing symptoms since patient began care at BCH 3 years ago." R. 941. Plaintiff has been diagnosed with serious physical and mental conditions by several doctors. Her treating physicians' opinions, including Dr. DiVasta's, are corroborated by extensive medical evidence in the record including the "assessments" and "plans" from the numerous medical visits spanning back to Plaintiff's early teenage years. Plaintiff consistently reported suffering from debilitating pain – routinely reaching a level of 7 or 8 out of 10 – that resulted in her being fired from a previous job.

Plaintiff's self-described limitations also support Dr. DiVasta's functional capacity assessment. The ALJ largely discounted Plaintiff's testimony about the limitations caused by her pain but failed to address the Avery factors in explaining that decision. See Pires v. Astrue, 553 F. Supp. 2d 15, 22 (D. Mass. 2008) (citing Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 1986)). The Avery factors, which inform the credibility of an applicant who alleges pain, are:

(1)  The nature, location, onset, duration, frequency, radiation, and intensity of the pain;
(2)  Precipitating and aggravating factors . . . ;
(3)  Type, dosage, effectiveness, and adverse side effects of any pain medication;
(4)  Treatment, other than medication, for relief of pain;
(5)  Functional restrictions; and
(6)  The claimant's daily activities.

Avery, 797 F.2d at 29. The ALJ did not analyze the type of pain that Plaintiff experienced, its intensity, or any precipitating and aggravating factors. While he referred to Plaintiff's pain medication treatments, calling them "conservative," he did not acknowledge her long history of being taken on and off various pain medications due to adverse side effects. As discussed further below, his discussion of Plaintiff's daily activities did not take into account her testimony that her pain – and therefore her activities – vary widely day to day.

Furthermore, although the ALJ acknowledged Plaintiff's endometriosis as a severe impairment, he did not sufficiently

17

consider the treating physician's opinion about the limitations caused by that impairment. Plaintiff's endometriosis manifested physically in the form of daily bleeding and sharp pains over the course of many days, as documented in her medical records. The state-agency doctors, on whom the ALJ heavily relied, neglected to note endometriosis as one of Plaintiff's conditions. Plaintiff's endometriosis is particularly relevant to Plaintiff's residual capacity because, in previous jobs, it caused her to miss several days of work. Dr. DiVasta's functional capacity assessment noted that Plaintiff would be absent from work for three or more days per month. The vocational expert testified that more than three absences per month "would eliminate work." R. 72. There is significant evidence in the record that is consistent with Dr. DiVasta's functional capacity assessment.

Next, the ALJ relied on evidence that should not be properly considered "inconsistent" with the limitations described by Dr. DiVasta. The ALJ noted that Plaintiff was able to play the guitar and go to the beach to swim on good days when her pain was not as severe. Plaintiff was clear that those activities occurred only a few days in a month. Plaintiff's medical records reflect that on some days, Plaintiff's pain would be at an 8 out of 10, and on others it would fluctuate between 0 and 7. The ALJ also noted that Plaintiff can "care for

her personal needs" and "travel independently." R. 28. Again, Plaintiff testified that she could do those activities on some days, but not others, and that activities like doctor visits will leave her "utterly exhausted" for several days. Under these circumstances, Plaintiff's daily activities are not inconsistent with the limitations described by Dr. DiVasta.

The ALJ also relied on Plaintiff's objective physical examination, stating that the "physical examination findings show no anatomical deformities in the claimants [sic] joints[,] . . . normal range of motion in the spine and joints[,] . . . [and] no evidence of any swelling, stiffness or tenderness in her joints." R. 28. The problem with relying heavily on the physical examination is that "[t]he musculoskeletal and neurological examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities." Johnson, 597 F.3d at 410 (quoting Harrison's Principles of Internal Med. 2056 (16th ed. 2005)). As a result, "a patient's report of complaints, or history, is an essential diagnostic tool in fibromyalgia cases, and a treating physician's reliance on such complaints hardly undermines his opinion as to [the patient's] functional limitations." Id. at 412 (internal quotations omitted). Here, Plaintiff testified to having to sit on a reclining couch for most of the day to rest. Plaintiff also stated that she has difficulty doing laundry and taking care of herself because of

19

her painful conditions. She has had crying fits for hours because of the debilitating pain, even though her external examinations appeared normal.

In sum, the ALJ did not adequately consider the relevant factors in making his decision that the treating physician's proposed limitations contradicted the record evidence. Neither did he consider the Avery factors in analyzing Plaintiff's subjective allegations of pain. Because the ALJ did not provide "good reasons" for giving little to no weight to Dr. DiVasta's opinion or the subjective allegations of pain, remand is required.

## ORDER

For the reasons above, the Court **DENIES** the Government's motion to affirm the Commissioner's decision (Dkt. No. 22) and **ALLOWS** Plaintiff's motion to remand (Dkt. No. 16).

SO ORDERED.

/s/ PATTI B. SARIS
Patti B. Saris
United States District Judge